UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MICHELLE FRIDAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:17-CV-380 JD |
| | ) |
| MAGNIFIQUE PARFUMES AND COSMETICS, INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Michelle Friday managed a Perfumania store in a Michigan City, Indiana mall. She had previously suffered nerve damage in a car accident, which somewhat limited her use of her hands and caused them to be atrophied, though that condition did not prevent her from doing her job. Ms. Friday alleges that during an inventory count in January 2016, her boss first noticed her hands' appearance and remarked that they "are disgusting." Several months later, he fired Ms. Friday, citing an excessive "shrink rate," or loss of inventory. Ms. Friday contends that this explanation was inaccurate and pretextual, and that the real reason was her boss' disapproval of the condition and appearance of her hands. In this suit, Ms. Friday claims that she was fired because of her disability and because she did not conform to her boss' expectations for how a woman should appear. Perfumania moves for summary judgment. For the reasons below, the Court denies the motion as to those claims, as Ms. Friday has offered evidence from which a reasonable jury could infer discrimination in those respects.

### I. FACTUAL BACKGROUND

Defendant Magnifique Parfumes and Cosmetics, Inc. operates retail stores under the name Perfumania. The stores sell perfumes and colognes, along with some other related items.

Michelle Friday began working for Perfumania as an assistant store manager in 2011, and worked at a store in the Lighthouse Mall in Michigan City, Indiana. She was promoted to store manager in September 2013. Some years earlier, Ms. Friday had been in a car accident in which she suffered nerve damage. As a result, she had limited mobility in her wrists, she experienced atrophy in her hands, and her fingers did not all function correctly; Ms. Friday testified that between her two hands, she has five fingers that work well. This condition caused Ms. Friday to do some tasks differently, such as when she would spray a perfume bottle to provide a sample, but both parties agree that the condition did not prevent her from doing her job. Throughout Ms. Friday's employment, her store was supervised by Doug England, a district manager who oversaw about 20 stores.

One of the metrics by which Perfumania measures the performance of its stores is their "shrink rate," which tracks the amount of product lost or stolen from the store. Perfumania measures the shrink rate by dividing the amount of missing inventory by the stores' total sales. The overall company goal is a shrink rate of 0.25% or less. If a store has a shrink rate of 0.10% or less, the store manager receives a bonus. If the store has a shrink rate of over 0.35%, it can be placed in the "target store program," during which inventory is counted more frequently and employees are required to take action to improve the shrink rate. Employees' commissions can also be reduced when the store is on target status.

To measure the shrink rate, each store conducts a full inventory count around January of each year. During those counts, the employees use handheld scanners and scan the barcode of every product in the store, shelf by shelf. To verify all products were scanned, employees also count and manually input the number of products on each shelf, which have to match the number of products scanned from that shelf. Certain products also have to be scanned twice, by two

different employees. Throughout the year, stores also conduct "cycle counts," during which the corporate office would send a list of products, which the stores then count manually. Those counts were conducted about once a month, as a spot-check, but the official shrink rate numbers were based on the annual inventories, which included all of the products in the store.

The store at which Ms. Friday worked had a history of poor shrink rate numbers. The store had been on target status for several years before 2012, and the store manager who preceded Ms. Friday had received a written warning for having high shrink rates. The shrink rate for 2012 (based on an inventory taken in early 2013) was 0.30%, and cycle counts conducted in early 2013 came in well over 1%. Ms. Friday took over as store manager later in that year, and the total shrink rate for 2013 came in at 0.33%, a slight increase over the previous year. That was still below the number that would place the store on target status, but the store was placed on target status "for monitoring purposes only," meaning the employees' commissions were not reduced.

In July 2014, a mid-year inventory count was conducted at Ms. Friday's store. The shrink rate came back as 0.7%. It came to light, though, that some products that had been moved off the sales floor and placed in a box in the back room had been omitted from the count. Thus, another inventory was conducted in October 2014 to account for those products. The store was placed on target status in the interim, but the employees' commissions were not cut, and the store was removed from target status after the new count. The year-end shrink rate for 2014 came in at 0.35%, again slightly higher than the previous year. Monthly cycle counts conducted throughout 2015 were good, though, with shrink rates generally below 0.1% and some reflecting no losses at all.

The year-end inventory count for 2015 was conducted in January 2016. Ms. Friday and three other employees were present to conduct the count, and Mr. England also came to assist. Ms. Friday testified that Mr. England began looking at her "very strangely" while she was moving product around, as if he was looking at something gross. He asked Ms. Friday what was wrong with her, and she responded that she had been in a car accident and had a little nerve damage. Mr. England responded by saying that her hands "are disgusting." Ms. Friday was offended and humiliated, but composed herself to finish the inventory.

Ms. Friday believes that this was the first time Mr. England noticed her condition. He had never mentioned or asked her about her condition, which she usually tried to conceal. His questioning and reaction during their conversation during the inventory also led her to believe he had not noticed her hands before. But from that point forward, Ms. Friday perceived that Mr. England treated her different than before. He would not answer her emails promptly or communicate with her, even as to day-to-day tasks that she needed to do her job. And whereas Mr. England used to greet her with a hug when he would visit the store, he did not do so after. Ms. Friday also testified that Mr. England looked at her differently, as if she was an inferior person.

In March 2016, the results came back for the 2015 inventory, and Ms. Friday's store had a shrink rate of 0.496%, a substantial increase over the previous year. After Mr. England sent her a list of each of the products reported missing from her store, Ms. Friday sent him an email raising multiple concerns with the accuracy of the results. She noted, for example, that some of the products reported missing were products that did not scan properly during the inventory count, for which they used substitute bar codes to scan. She also noted that other products that were reported missing had been sent back because they were shipped with improper bar codes,

and that for various other items, the numbers reported missing were implausible. Mr. England never responded to Ms. Friday's email, though, or to the follow-up emails or calls in which she tried to raise the inaccuracies. Instead, Mr. England told Perfumania's human resources representative that he wished to fire Ms. Friday for the poor shrink rate. After drafting a corrective action form and receiving approval, Mr. England met with Ms. Friday on May 3, 2016, and informed her that she was being fired for her store's poor shrink rate.

After filing a charge of discrimination with the Equal Employment Opportunity Commission, Ms. Friday filed this suit. Discovery has closed and Perfumania moved for summary judgment, and that motion is fully briefed.

## II. STANDARD OF REVIEW

A court must grant summary judgment if the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations contained in its pleadings but must present evidence sufficient to show the existence of each element of its case on which it will bear the burden at

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## III. DISCUSSION

Ms. Friday asserts claims under the Americans with Disabilities Act and Title VII. Her complaint asserted one count under each statute, but referred to three theories within each count: discrimination, harassment, and retaliation. Perfumania moves for summary judgment in each respect. In response to the motion, Ms. Friday expressly disclaimed any hostile work environment claim. [DE 38 p. 21]. And though she did not disclaim her retaliation claims, she did not present any argument in support of or even mention any claim for retaliation. The Court therefore grants summary judgment against any claims for a hostile work environment or retaliation. The claims Ms. Friday focuses on now are that Perfumania discriminated against her based on her disability and sex when it terminated her employment. Those claims overlap substantially, as they both center on the allegation that Ms. Friday was fired because of the condition and appearance of her hands.

The Court begins by addressing the claim for disability discrimination. The Americans with Disabilities Act prohibits employers from discriminating against disabled employees because of their disability." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011); 42 U.S.C. § 12112(a). A claim for disability discrimination requires a plaintiff to prove that: (1) she is disabled; (2) she was qualified to perform the essential functions of her job; and (3) her employment was terminated because of her disability. *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 622 (7th Cir. 2012). The parties do not dispute that Ms. Friday was disabled or that she was able to perform the essential functions of her job. The only question is whether she has offered evidence from which a jury could infer that she was fired because of her disability. In evaluating questions of causation, courts consider the evidence as a whole and

ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge[.]" *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[1]

The Court concludes that Ms. Friday has offered sufficient evidence to permit that inference. To start, Ms. Friday testified that Mr. England expressed disgust upon noticing her condition. According to Ms. Friday, Mr. England began looking at her "very strangely" during the January 2016 inventory count, as if he was looking at something gross, and he asked her what was wrong with her. Ms. Friday told him she had been in a car accident and had nerve damage in her hands. Mr. England responded by saying that her hands "are disgusting." [DE 39-15 p. 90]. "Disgust" is a strong word, and that comment and Mr. England's reaction would permit a jury to find that Mr. England viewed her condition with disfavor.

Ms. Friday also testified that Mr. England began treating her differently immediately after that incident, which she believes was the first time he noticed her hands' condition.[2] After the January 2016 inventory count, Mr. England stopped communicating with or responding to Ms. Friday, even as to day-to-day issues that were necessary to do her job, like scheduling. He also failed to come into her store even when he was in other nearby stores, which Ms. Friday found odd. Ms. Friday also testified that in the past, Mr. England would always greet her with a

---

[1] Ms. Friday does not invoke the *McDonnell Douglas* burden-shifting framework, so the Court does not address it.

[2] Ms. Friday testified that Mr. England had never previously mentioned or manifested an awareness of her condition, which she usually tried to conceal, and his questioning and reaction during the inventory count suggested he had not previously been aware. Mr. England testified to the contrary, stating, for example, that he never called Ms. Friday's hands disgusting and didn't speak to Ms. Friday about them during the January 2016 inventory, and that he noticed Ms. Friday's hands early in her employment, as her condition was unmistakable when she sprayed samples. At summary judgment, though, the Court views the facts in the light most favorable to Ms. Friday, so this contrary testimony only creates factual disputes the jury will have to resolve.

hug when he came to her store, but that he did not do so after this incident. Though she noted that the hugs were not particularly welcome to begin with, it was conspicuous and became even more uncomfortable that he stopped doing so. Ms. Friday also testified that after Mr. England noticed her condition, he began looking at her and treating her in a way that conveyed that she "was just a very inferior person," and that he had never treated her that way before. [DE 39-15 p. 106–07]. This change in treatment came directly on the heels of when Mr. England learned of her condition, which, coupled with the disparaging remark, could suggest that her condition prompted that change.

A jury could also find that Perfumania's explanation for firing Ms. Friday was pretextual, meaning that the shrink rate did not truly motivate its action. Ms. Friday argues in part that Mr. England sabotaged the inventory count after he noticed her hands, a theory that Perfumania casts as pure speculation. Regardless of whether Mr. England was responsible for the results, though, it suffices for these purposes to note that Mr. England expressed no interest in the accuracy of the results once Ms. Friday gave him specific reasons to believe the results were flawed. When Mr. England sent Ms. Friday the shrink rate results, he attached a listing of each of the items that came up as missing. Ms. Friday responded with an email in which she noted multiple concerns with the accuracy of that report. For example, she wrote that some of the items reported missing were products that did not scan properly during the inventory count. Those products were thus scanned using substitute bar codes, but they came up as missing in the results. Mr. England never responded to that email, though. Ms. Friday sent follow-up emails and tried to call Mr. England several times, too, but he never responded or spoke to Ms. Friday about those issues.

Of course, pretext does not look to whether an employer's stated reason was correct, only whether it was the real reason. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("The

question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge."). If Mr. England was mistaken, but honestly so, in believing the shrink rate was high, that would not support a claim. But Mr. England's indifference to whether the shrink rate was accurate, and his failure to respond to Ms. Friday's email and other communications pointing out problems with the count, could call into question whether Mr. England was actually concerned with whether the shrink rate was high.

That is particularly so when compared to how Mr. England treated a previous inventory that resulted in a high shrink rate. In July 2014, a mid-year inventory count was conducted at Ms. Friday's store. The results showed a shrink rate of 0.7%, much higher than the 0.49% rate that preceded her firing. At that time, the store was placed on "target status," but "for monitoring purposes only," meaning there was no reduction in commission. In addition, it came to light that the results were not accurate, as some products that had been moved to the back room had been inadvertently overlooked during the inventory count. After discussing that inaccuracy, a new inventory count was conducted shortly thereafter to account for those missing products, and the store was moved off target status.

The results of the January 2016 inventory count produced a much different reaction. After receiving the results, Ms. Friday sent Mr. England an email noting specific problems with the accuracy of the count. But instead of following up, as he did before, Mr. England did not respond at all. Nor did he respond to Ms. Friday's subsequent emails and phone calls attempting to correct the inaccuracies. And though the shrink rate was substantially lower than the July 2014 count, Ms. Friday was not merely placed on target status, she was fired. Notably, the January 2016 results came after Mr. England became aware of Ms. Friday's condition, while the previous

9

results came before he was aware. In that sense, Ms. Friday is her own comparator. When the shrink rate came in unusually high before he was aware of her disability, Mr. England only placed the store on target status and then held a new inventory to resolve the discrepancy; when the shrink rate came in unusually high afterwards, he ignored her concerns about the inaccuracy of the count and went straight to firing her. This departure from past practice could support an inference that the shrink rate was pretextual, and that the intervening event—Mr. England's becoming aware of Ms. Friday's disability—was responsible for the difference.[3]

Viewing that evidence in combination, a jury could find that Perfumania fired Ms. Friday because of her disability. Mr. England's lack of interest in the accuracy of the inventory could suggest that his reliance on the shrink rate was pretextual, particularly when compared to how he handled a similar situation before learning of Ms. Friday's condition. And his disparaging remark about Ms. Friday's hands and his change in treatment of her immediately afterwards could support an inference that her hands were the true reason for his action. Because a jury could find that Perfumania fired Ms. Friday because of her disability, the Court denies summary judgment on that claim.

For many of the same reasons, the Court concludes that a jury could find that Ms. Friday was fired because of her sex. Ms. Friday contends that she was fired because, in light of her hands' condition, she didn't conform to stereotypic expectations for her appearance as a female, and that Mr. England would not have reacted the same way had she been a male. Title VII prohibits discrimination because of an individual's sex. 42 U.S.C. § 2000e-2(a). Courts have held that this cause of action applies "when an adverse action is taken because of an employee's

---

[3] Of course, there are other possible inferences, too, some of which Perfumania argues in its briefs. But Ms. Friday is entitled to have the facts viewed and the inferences drawn in her favor at summary judgment.

failure to conform to sex stereotypes." *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1048 (7th Cir. 2017) (collecting cases).

As already discussed, a jury could find that Ms. Friday was fired because of the condition or appearance of her hands. Thus, the question underlying this claim is whether a jury could infer that her hands' appearance caused her firing because that meant she did not conform to the stereotypes for her sex. The Court believes that a jury could draw that inference. When making hiring decisions, Mr. England often remarked on the applicants' looks, and he told Ms. Friday that he wanted to hire attractive people for sales purposes. Ms. Friday cited multiple examples of Mr. England commenting on women's appearance. As to one applicant, Mr. England remarked that she was very attractive, which he said would help her sales. This draws a connection between Mr. England's perception of attractiveness and his personnel decisions. As to Ms. Friday, Mr. England had previously told her that she was attractive. But after noticing her hands and calling them "disgusting"—a direct reference to their appearance, not just the presence of a disability—he treated her different, leading to her firing. A jury could thus find that Mr. England fired Ms. Friday because he no longer thought she looked like he believed a woman should look.

Perfumania argues in response that this was not a matter of sex discrimination but merely a preference for attractiveness, whether in males or females. Though a jury could reach that conclusion, the evidence would not compel a jury to slice the issue that thin. Ms. Friday testified to multiple examples of Mr. England commenting on female employees' and applicants' attractiveness, and testified that he once hired a female he called attractive over other male applicants that Ms. Friday wanted to hire. A jury could conclude that Mr. England valued attractiveness more in females and that he fired Ms. Friday because she no longer fit the

stereotypic appearance for her sex. Thus, the Court denies summary judgment on the claim for sex discrimination too.

## IV.  CONCLUSION

The Court GRANTS the motion for summary judgment [DE 34] as to any claim for retaliation or for a hostile work environment. However, the Court DENIES the motion as to the claims for disability and sex discrimination.

SO ORDERED.

ENTERED:  July 11, 2019

/s/ JON E. DEGUILIO  
Judge  
United States District Court
